**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

---

|                               |   |                               |
|-------------------------------|---|-------------------------------|
| EDWARD J. ROMAN, Sr.,         | : |                               |
|                               | : | Civil Action No. 16-7256(RMB) |
| Petitioner                    | : |                               |
|                               | : |                               |
| v.                            | : | **OPINION**                   |
|                               | : |                               |
| WILLIE BONDS, *et al.*,       | : |                               |
|                               | : |                               |
| Respondents                   | : |                               |

---

APPEARANCES:

Robert C. Pierce, Esq.,
3350 Route 138, Bldg. 1, Suite 113
Wall, New Jersey, 07719
        On behalf of Petitioner

Gretchen Anderson Pickering, Esq.
CAPE MAY COUNTY PROESCUTOR'S OFFICE
4 Moore Road-DN-110
Cape May Courthouse, NJ 08210
        On behalf of Respondents

**BUMB**, District Judge

    This matter comes before the Court upon the Amended Petition

for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Am. Pet., ECF

No. 13) filed on behalf of Petitioner Edward J. Roman, Sr.

("Petitioner".) Petitioner alleges seven grounds for relief from

his March 12, 2003 judgment of conviction for aggravated

manslaughter in the Superior Court of New Jersey, Law Division,

Cape May County. (Id.) Respondents filed an answer opposing habeas

relief and submitted the state court record. (Answer, ECF No. 18.) Petitioner filed a reply brief on February 15, 2019. (Petr's Reply, ECF No. 21.) The amended petition will be determined on the record pursuant to Federal Rule of Civil Procedure 78(b).

## I.    PROCEDURAL BACKGROUND

On March 12, 2003, a judgment of conviction on aggravated manslaughter was entered against Petitioner after a jury trial in the Superior Court of New Jersey, Law Division, Cape May County. (Judgment of Conviction, ECF No. 18-17.) Petitioner was sentenced to a 27-year term of imprisonment with an 85% parole qualifier. (Sentencing Tr., ECF No. 18-16.) Petitioner filed a direct appeal and his conviction was affirmed by the Appellate Division on November 1, 2005. State v. Roman, ("Roman I"), 887 A.2d 715 (App. Div. 2005). The New Jersey Supreme Court granted Petitioner's petition for certification, 188 N.J. 219 (2006), but then dismissed the petition on January 18, 2007, as improvidently granted. State v. Roman, 189 N.J. 420 (2007).

Petitioner filed a petition for post-conviction relief, which was denied on August 13, 2008. (PCR Pet., ECF No. 18-27; PCR Court Order, ECF No. 18-31.) On October 19, 2010, the Appellate Division affirmed the PCR Court in part, and reversed and remanded in part for a limited hearing. State v. Roman ("Roman II"), 2010 WL 4103531 (App. Div. 2010). The New Jersey Supreme Court denied Petitioner's

petition for certification on March 16, 2011. State v. Roman, 205 N.J. 273 (2011).

The issue that was remanded to the PCR Court for an evidentiary hearing as to whether trial counsel was ineffective by refusing to call Dr. Shane as an expert witness for financial reasons. (Am. Pet., ECF No. 18 at 18-19.) Following the hearing, in an order dated June 14, 2012, the PCR Court denied relief. (PCR Court Order, ECF No. 18-42.) The Appellate Division affirmed the PCR Court on June 23, 2015. State v. Roman ("Roman III"), 2015 WL 3843266 (App. Div. 2015). The New Jersey Supreme Court denied certification on November 6, 2015. State v. Roman, 223 N.J. 404 (N.J. Nov. 6, 2015).

On September 12, 2016, Petitioner filed a motion for resentencing pursuant to State v. Natale. (Not. of Mot., ECF No. 18-50.) A resentencing hearing was held on November 16, 2016, in the Superior Court of New Jersey, Law Division, Cape May County. (Resentencing Tr., ECF No. 18-53.) On November 30, 2016, an amended Judgment of Conviction was entered, and the same sentence was imposed. (Am. JOC, ECF No. 18-54.) Petitioner appealed, (Not. of Appeal, ECF No. 18-56), but the Appellate Division affirmed his sentence on May 3, 2017 (App. Div. Opinion, ECF No. 18-57.)

Petitioner filed his original habeas petition on October 14, 2016. (Pet., ECF No. 1.) Respondents filed a motion to dismiss the petition as untimely. (Mot. to Dismiss, ECF No. 6.) The Court

3

denied Respondents' motion to dismiss on August 17, 2018. (Order, ECF No. 10.) Petitioner filed his amended petition on October 2, 2018. (Am. Pet., ECF No. 13.) Respondents filed an answer to the amended petition on December 24, 2018. (Answer, ECF No. 18.) Petitioner filed a reply on February 15, 2019. (Petr's Reply, ECF No. 21.)

II. FACTUAL BACKGROUND

The Appellate Division, on direct appeal, made the following findings of fact.

> Defendant and his girlfriend, Melanie Holton, were the parents of twin seven-week-old boys. Holton, the grandparents, and the babies' godfather and defendant's best friend, Michael Wilkins, all testified that defendant appeared, before the unfortunate incident to be a loving, protective, and fully involved parent of the newborns.
>
> On September 23, 2001, however, defendant was babysitting the newborns while Holton was shopping with a friend. While the newborns were in defendant's care, Edward Jr. died. Defendant's initial version of the death, which he provided during a 9-1-1 call and thereafter at the hospital, was that Edward Jr. fell off a couch while defendant was assisting the other twin.
>
> An autopsy revealed, however, that Edward Jr. died from multiple skull fractures, hemorrhaging, front subdural bleeding and a swelling of the brain that was allegedly caused by blunt force to two different parts of his head. The autopsy also revealed twenty-seven fractures of the newborn's ribs in various stages of healing. An examination of the other twin disclosed seventeen rib fractures also in different stages of healing.

Consequently, during the investigation of Edward Jr.'s death, the Division of Youth and Family Services temporarily removed the other twin from the care of defendant and Holton.

On September 25th, the prosecutor's office followed up on some statements taken at the hospital and further interviewed defendant and Holton. During this interview, the officers were informed that Holton's parents had retained an attorney to represent the couple. The attorney requested that the police stop interviewing defendant and Holton and inform the couple that he advised them to stop speaking with the police. The officers informed defendant of the representation and gave him the lawyer's phone number.

At trial, the officer could not recall whether he had also informed defendant of the attorney's advice to stop speaking with the police. Defendant testified at trial that after being given the attorney's phone number he asked the officers what the attorney had said. The officers allegedly responded that they did not know, but if defendant did not do anything wrong, he did not need an attorney.

In any event, one of the officers asked defendant whether he wished to continue speaking with them and defendant agreed by signing a "Reed Advisory." Defendant also signed a Miranda Warning and Waiver of Rights form and continued speaking with the police until counsel arrived, when defendant exercised his right to remain silent.

That night, one of the investigators received a message from defendant's father on his home answering machine. Defendant's father and the investigator knew each other and had a social relationship. When the investigator called back, defendant's father asked the whereabouts of his son and "what was going on." The investigator explained that "everything was going fine with the questioning and they had a few more questions to answer, but the lawyer

stopped it all" and that defendant "should come back and finish his statement." The investigator told the father that "the autopsy wasn't matching up with the questioning of ... the statements that [defendant] was making." Defendant's father told the investigator that his son wanted to return to clear everything up. Defendant's father asked how his son could come in or continue the statement. The investigator advised defendant's father that his son "ha[d] a right to hire a lawyer and ... a right to fire a lawyer[.]"

Later that evening, defendant came to his parents' home seeking advice. Apparently trusting the investigator, defendant's father told defendant to go back the next day and finish the statement without the attorney. Defendant also spoke with his friend, Wilkins, who also encouraged defendant to go back and continue the statement.

The next day, September 26th, defendant fired his attorney and reported to police headquarters where an investigator and detective continued defendant's interrogation. Defendant received <u>Miranda</u> warnings and waived his right to an attorney, expressing his desire to revoke the previously asserted right to remain silent and continue with his statement.

Defendant began his statement by discussing the details of the children's birth, development, and care. The investigator was impressed with defendant's knowledge of his children and suspected, at that time, that defendant was a very involved, interested parent. When asked about the events of September 23rd, defendant repeated his original explanation of the incident. But, this time, the investigator confronted defendant with the autopsy report and said there were "two kids in your house who are seven weeks old. One kid is dead and the other kid is following the same path, got multiple injuries." Considering "the autopsy, it didn't

happen the way you said it. Now there's something very wrong here and this is what we need to talk about." The investigator explained that the baby "could not get injuries ... more than one head fracture[,] from one fall," by falling off a couch of that height. At this point, "the tenseness in the room was ratcheted up."

Defendant then decided to tell the investigator something he "really never told" anyone and divulged the following second version of the incident: "in his haste to save the baby," after Edward Jr. had fallen from the couch, "he had picked the baby up and had run toward the bedroom where he was going to do CPR. But, in his haste, he tripped and the baby fell out of his arms and now he hit the floor." When questioned about the newborn's old injuries, however, defendant could not provide any credible explanation. The investigator was not impressed with the second version and kept pressing defendant, who then came up with a third version of the incident.

In the third version, defendant stated that, when he dropped the baby, "he actually slid across the floor and he hit the wall with some force." The investigator again expressed his disbelief, but did not threaten, coerce, or scream. In fact, throughout the examination, the investigator claimed to have treated defendant as if he were a father with a dead son, not a criminal suspected of murder.

At some point according to defendant, both the investigator and detective left the room, and a woman lieutenant entered and began questioning him. She told defendant that he was lying and that his other son was going to be placed for adoption. At that moment, defendant claimed to be very upset and testified at trial that he decided to tell the investigators "whatever they want[ed] to hear."

The investigator disagreed with defendant's recollection of this occurrence. He testified that the lieutenant, who was his superior officer, did not enter the room until after the confession.

In any event, after the investigator had informed defendant that his stories were not jibing with the physical evidence, and the tension had been significantly increased, defendant asserted that he needed "to talk to my parents; I want to talk to my father." The interrogating investigator, tried to find out precisely what defendant meant. The investigator asked "do you want to tell your father first, and you're going to tell us?" In response, defendant said "I want to talk to my father." The investigator then sat for maybe thirty seconds, "mulling over where we were." He then got up and told defendant he was "going to go get your father," and he left the room.

The investigator did not attempt to contact defendant's father. Instead, he spoke to his superiors and wanted to check on the status of the interview with Holton, who was also being questioned at that time. About two or three minutes later, the investigator reentered the interrogation room intending to tell defendant they were bringing in his father. When the investigator reentered the room, defendant was sobbing and telling a detective that he was the murderer who killed his son.

The detective, who had remained with defendant after the investigator left the room, explained at trial that when the investigator left, he thought defendant's parents would be brought in. He "wasn't sure what was going to happen next." He asked defendant, according to his trial testimony, "what's going on? ... what do you want to talk to your parents about and [defendant] says don't worry ... I'll tell you what happened after I talk to my parents." The detective stated that he had "known [defendant] for a while .... you want to tell me?" Defendant then "became very emotional and

he put his hands up like this and he said I
murdered my son." Defendant then explained how
he "lost it" and "slammed the baby in between
[his] knees because he wouldn't stop crying."
The detective was "shocked" and slid his chair
toward defendant, putting his arm on
defendant's shoulder to "comfort" him.

Upon the investigator's return, defendant was
crying: "I'm a murderer; I killed my son; I'm
a murderer."

Defendant subsequently repeated the
confession to his parents and in a tape
recorded statement. However, defendant denied
ever striking the babies before, but admitted
to having been tempted to do so in the past.
He then stated that all previous versions of
the incident were not true. After the
recording was over, defendant listened to the
tape and signed an affidavit acknowledging his
taped statement and swearing that it was given
voluntarily and truthfully.

At trial, three medical experts testified that
Edward's injuries were the result of
intentional infliction of child abuse. The
head fractures were most likely caused by a
forceful striking of the head, although one
expert believed the fractures "could also have
occurred were the head to have been squeezed
between the knees of the individual holding
him." The experts also opined that the rib
fractures on both left and right sides of
Edward Jr.'s rib cage were consistent with
squeezing the newborn. They were not caused,
as urged by the defense, at birth, by
administering CPR, or by hugging or burping
the babies. The experts also believed that all
of the fractures did not occur on the day of
Edward Jr.'s death, but some of the child's
ribs had been broken previously.

Defendant testified on his own behalf. He
first admitted pleading guilty as an accessory
to third-degree burglary when he was twenty
years old. He then testified to his

girlfriend's high risk pregnancy and delivery of the twins. He portrayed himself as an involved concerned parent, helping with doctor appointments and caring for the babies.

He explained the September 23rd incident as follows: he was exhausted and trying to feed Edward Jr., but the baby refused to take the formula and was moving his head from side to side screaming. Defendant grabbed Edward Jr. and unintentionally hit him against his knee caps once and the baby became unconscious. As a result, formula started to come out of the newborn's mouth and nose, and defendant ran into his bedroom trying to suction formula and blow air into the baby's lungs.

Defendant admitted lying about the incident to the 9-1-1 dispatcher, the police, hospital personnel, his parents, and friends. He stated that he told the investigators what they wanted to hear because he wanted his other son to stay with Holton and because he felt scared and confused. He denied shaking, squeezing, or abusing his children.

The jury acquitted defendant of aggravated assault … and of endangering the welfare of both twins…. However, the jury found defendant guilty of aggravated manslaughter, as a lesser included offense to first degree murder, of Edward Jr.

State v. Roman, 887 A.2d 715, 718–22 (N.J. Super. Ct. App. Div. 2005).

On October 19, 2010, the Appellate Division made the following findings upon review of the denial of Petitioner's petition for post-conviction relief.

Defendant argues in Point I that his privately retained trial counsel did not call Dr. John J. Shane, defendant's forensic pathologist, because defendant did not have the funds to

pay the expert's $2500 testimonial fee. Dr. Shane determined that the baby's death was due to "terminal hypoxia" caused by improper resuscitation efforts, that his fractured skull was caused by a single traumatic injury to the occipital bone and that both babies' fractured ribs occurred during childbirth.

Defendant maintains that he decided to testify believing his expert would be called as a witness. He also claims that the $50,000 fee he paid his trial counsel included payment of the expert. Whether or not defendant's payment included expert fees, trial counsel should not fail to call a needed expert witness due to defendant's lack of funds without first seeking assistance from the public defender. See In re Cannady, 126 N.J. 486, 498 (1991); In re Kauffman, 126 N.J. 499, 501-02 (1991).

Defendant argues that his forensic pathologist might have persuaded the jury to convict him of the second degree crime of reckless manslaughter, N.J.S.A.2C: 11-4b(1). The trial court found that defendant's incriminating statement while in custody coupled with the other evidence adduced by the State was so strong that the Dr. Shane's testimony would not have reasonably changed the jury verdict.

We are not so convinced. Dr. Shane's testimony went to the very heart of the causation of the child's death. The jury had concerns about the strength of the State's case in that; they did not convict defendant of causing the rib injuries to either child. Evidence was presented that defendant had been a caring, involved parent. If trial counsel, knowing the weaknesses in Dr. Shane's evidence, chose not to call him for strategic reasons, such a decision would not be evidence of ineffective assistance of counsel. See State v. Castagna, 187 N.J. 293, 315 (2006). If the decision was indeed made exclusively on economic grounds without concern for trial strategy, however, defendant might well be entitled to a new trial if the court finds that the lack of the

expert testimony resulted in a "miscarriage of' justice." See generally State v. Perez, 177 N.J. 540, 555 (2003). Accordingly, we are constrained to remand the matter for an evidentiary hearing limited to a determination of whether defense counsel was ineffective in failing to call Dr. Shane to testify at trial.

Defendant also argues that his trial counsel was ineffective in not cross-examining the State's medical examiner about his mistake in another murder case which resulted in the termination of his employment. Trial counsel did tell the jury about this mistake in summation. The medical examiner's prior error was thus revealed to the jury; whether that occurred in cross-examination or summation is a matter of trial strategy.

Dr. Danielle Boal, the State's pediatric radiologist, issued a report indicating she would testify regarding the rib fractures and that she had not seen the victim's CT scan. She did not mention skull fractures. Without notice to the defense or submission of a supplemental report, Dr. Boal reviewed the CT scan one month prior to trial and testified that the child had suffered a non-accidental, severe brain injury. Defense counsel objected to this testimony, which was not included in her initial report. The trial court sustained the objection. Defendant argues here that trial counsel should have moved for a mistrial, requested that the testimony be stricken or requested a limiting instruction. Although trial counsel's failure to request this additional relief does not constitute ineffective assistance of counsel, the State's use of this testimony highlights the potential importance of Dr. Shane's forensic testimony.

Defendant also alleges in his first argument point that trial counsel was ineffective in other respects that lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3e(2).

In Point II defendant argues that the state failed to provide him with material exculpatory evidence pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215, 218 (1963). "In order to establish a <u>Brady</u> violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." <u>State v. Martini</u>, 160 N.J. 248, 268 (1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682, S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985).

Defendant argues that the failure to provide a supplemental report from Dr. Boal and opinions from the other State doctors concerning the CT scan violated his <u>Brady</u> rights. This expert forensic evidence was not exculpatory in nature and does not implicate defendant's rights under <u>Brady</u>. Defendant further asserts that the State's failure to provide information regarding the medical examiner's botched autopsy resulted in a <u>Brady</u> violation. The prior autopsy, however, was known to defense counsel who used the information in his summation. Moreover, this autopsy was not directly related to the case against defendant nor could it fairly be considered exculpatory in nature. In addition, defendant did not raise this issue on direct appeal and thus it is not properly before the court pursuant to Rule 3:22-4(a)(I).

### III.

Defendant argues in Point III that he was deprived of effective assistance of appellate counsel. … Defendant argues appellate counsel was ineffective in not raising the <u>Daniels</u> issue. The <u>Daniels</u> case was decided after the direct appeal was filed and was addressed by

us in our decision. Roman, supra, 382 N.J. Super. at 58-59. This argument is therefore precluded by Rule 3:22-5 as we adjudicated this ground for relief on direct appeal.

Defendant argues that appellate counsel was also ineffective in not raising the issue of the prosecutor's misconduct in failing to provide pre-trial discovery regarding Dr. Boal's supplemental testimony. Appellate counsel did raise prosecutorial misconduct on appeal, but did not include the issue of the pre-trial discovery violation. We do not find that this omission merits the Strickland/Fritz standard discussed above. This claim would not have changed our finding that the cumulative prosecutorial misconduct did not deprive defendant of a fair trial. Roman, supra, 382 N.J. Super. at 61 (citing State v. Josephs, 174 N.J. 44, 124 (2002)).

IV.

Defendant argues in Point IV that he was deprived of his Sixth Amendment right to compulsory process. State v. Correa, 308 N.J. Super. 480 (App. Div. 1998) (reversing a conviction based on a violation of defendant's Sixth Amendment right to compulsory process because the terms of the plea agreement provided that the State would not seek an extended prison term for co-defendant if that co-defendant refused to testify for defendant.). He claims that the mother of his children did not testify because she was threatened by the Division of Youth and Family Services (DYFS). Following the victim's death, the surviving twin was removed from the mother's custody by DYFS. Defendant claims that she did not testify because she was told she would not receive her child back if she testified on behalf of defendant. The mother was not a witness to the incident. Other witnesses testified to the good care defendant gave his children prior to the incident. Her proffered testimony that she never observed defendant abuse either baby would have been

cumulative. Defendant also presented no
competent evidence that the mother was
threatened by DYFS.

V.

In Point V, defendant maintains that the
aggregate errors denied him a fair trial. This
claim warrants little discussion. As we have
already concluded, many of the issues upon
which defendant claims error were not errors
at all and, to the extent there were any
errors, they did not deny him a fair trial.

We do agree in part with defendant's argument
in Point VI requesting an evidentiary hearing.
As set forth above, an evidentiary hearing is
necessary to determine the reasons for trial
counsel's decision not to call the defense
forensic pathologist. Accordingly, we remand
for an evidentiary hearing solely on the
question of whether trial counsel improperly
decided not to call Dr. Shane as a witness for
economic reasons.

<u>Roman II</u>, 2010 WL 4103531 (App. Div. 2010).

The PCR Court held an evidentiary hearing upon remand on
August 3, 2011, November 2, 2011, February 2, 2012, and March 20,
2012. (PCR Evid. Hrg. Tr., ECF Nos. 38-41.) After the hearing, the
PCR Court denied relief. (PCR Court Order on Remand, ECF No. 42.)
Petitioner appealed. On June 23, 2015, the Appellate Division made
the following findings, in relevant part:

On remand, the PCR judge held a two-day
testimonial hearing at which the State
presented testimony from defendant's former
trial attorney, and the defense presented
testimony from Dr. Shane, defendant, his
mother, and two family friends. The testimony
is discussed in length in the PCR judge's
comprehensive opinion issued on March 20,

15

2012, and need not be repeated here. For our purposes, it is sufficient to summarize the PCR judge's findings, which are supported by sufficient credible evidence.

The PCR judge believed the trial attorney's explanation for his decision not to call Dr. Shane as a witness. The attorney explained that, in addition to representing defendant in the criminal case, he represented him in a civil Title 9 action filed by the Division of Youth and Family services. Dr. Shane testified at the Title 9 trial, and the Family Part judge did not find his testimony persuasive. The Family Part judge's written opinion, which stated myriad reasons why that judge did not find Dr. Shane to be a credible witness, was introduced in evidence at the PCR hearing. The trial attorney testified that defendant's ability to pay Dr. Shane as a witness in the criminal trial was not an issue in his decision. Rather, he did not call Dr. Shane as a witness in the criminal trial because he did not think the jury would believe his testimony.

After hearing Dr. Shane testify at the PCR trial, the PCR judge found that Dr. Shane had been forced on cross-examination to concede important points helpful to the State. The judge further credited the trial attorney's testimony that, shortly before the trial, he became aware of possible inaccuracies in Dr. Shane's curriculum vitae. The judge likewise found believable the attorney's explanation that calling Dr. Shane as a witness would have involved Dr. Shane repeating for the jury the most graphic medical testimony about the baby's injuries, and the State then reinforcing that testimony through rebuttal witnesses. The attorney's view at the time was that the best defense was that whatever happened to the baby occurred by accident; additional gruesome medical testimony would not have furthered the defense.

The judge also believed the attorney's
testimony that he discussed these strategic
points with defendant, who agreed with the
strategy. The judge noted that, in many
respects, the trial attorney's strategy was
successful, because the jury acquitted
defendant of most of the charges, including
first-degree murder.

The judge also believed the attorney's
testimony that economic considerations played
no part in the decision not to call Dr. Shane
as a witness. The judge credited Dr. Shane's
testimony that he would not have demanded his
fee in advance; that testimony was
corroborated by documentary evidence showing
that the doctor's practice was to submit his
bills after he performed the work. The judge
was not persuaded by the testimony of
defendant and his lay witnesses.

After finding that defense counsel did not
render ineffective assistance by making a
strategic decision not to call Dr. Shane as a
trial witness, the judge added that he did not
find it likely that, even if Dr. Shane had
testified, it would have changed the outcome
of the trial.

. . .

Except as addressed below, defendant's
arguments are without sufficient merit to
warrant discussion in a written opinion. R.
2:11-3(e)(2).

Pursuant to the terms of our limited remand,
the PCR judge's factual findings and
credibility determinations are critically
important. The judge's mandate was "solely" to
determine whether defendant's trial attorney
refrained from calling Dr. Shane as a trial
expert for economic reasons or for strategic
reasons. Roman II, supra, slip. Op. at 14.
Based on the testimony that he found credible,
including the testimony of defendant's former
trial attorney, the PCR judge found that

economics were not a factor in the attorney's decision, and the reason the attorney decided not to call Dr. Shane as a witness for reasons of trial strategy.

Our review of the PCR judge's findings is limited to whether they are supported by sufficient credible evidence. State v. Nash, 212 N.J. 518, 540 (2013). We owe special deference to the judge's credibility determinations, because he saw and heard the witnesses testify. Ibid.; State v. Locurto, 157 N.J. 463, 474 (1999). Based on our review of the transcripts, we find no basis to disturb the judge's factual findings, which definitively answer the questions we posed in remanding this case.

Roman III, 2015 WL 3843266 (App. Div. June 23, 2015).

III. THE AMENDED PETITION

Petitioner raises the following seven grounds for relief in his amended habeas petition:

> GROUND ONE: Edward Roman's request while being questioned by police was a re-assertion of his right to remain silent, and thus the police were required to reissue Miranda warnings before continuing what amount[ed] to custodial interrogation.
>
> GROUND TWO: Whether viewed individually or in combination, the Prosecutor's comments and conduct amount to misconduct which violated Mr. Roman's right to a fair trial.
>
> GROUND THREE: The police violated Mr. Roman's Fifth Amendment rights at the hospital.
>
> GROUND FOUR: Mr. Roman's prison term (27 years) is of excessive duration.
>
> GROUND FIVE: Mr. Roman received ineffective assistance of trial counsel.

GROUND SIX: At trial, the Prosecutor violated Edward Roman Sr.'s rights under <u>Brady v. Maryland.</u>

GROUND SEVEN: Edward Roman Sr. was denied effective assistance of appellate counsel.

(Am. Pet., ECF No. 13.)

IV. DISCUSSION

A. <u>Habeas Standard of Review</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). The

19

phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412. Further, "'clearly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). If there is no Supreme Court precedent on the issue presented, the state court's decision cannot be to the contrary. Woods v. Donald, 135 S. Ct. 1372, 1377 (2015).

> A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth" in Supreme Court precedent, Williams, 529 U.S. at 405, 120 S.Ct. 1495, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from that reached by the Supreme Court, id at 406, 120 S.Ct. 1495.

Eley, 712 F.3d at 846.

An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)). "'[W]here the 'precise contours' of [a] right remain 'unclear,' state courts enjoy 'broad discretion' in their adjudication of a prisoner's claims.'" Woods, 135 S. Ct. 1372, 1377 (quoting White v. Woodall, 572 U.S. 415, 424 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003) (in

turn quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 998 (1991)

(KENNEDY J., concurring in part and in judgment).

> A state court decision is based on "an
> unreasonable determination of the facts" only
> if the state court's factual findings are "
> 'objectively unreasonable in light of the
> evidence presented in the state-court
> proceeding.' " <u>Miller-El [v. Cockrell]</u>, 537
> U.S. [322,] 340, 123 S.Ct. 1029 [2003]
> (citing, *inter alia*, 28 U.S.C. § 2254(d)(2)).
> Moreover, the factual determinations of state
> trial and appellate courts are presumed to be
> correct. <u>Duncan v. Morton</u>, 256 F.3d 189, 196
> (3d Cir.2001). The petitioner bears the burden
> of "rebutting the presumption by 'clear and
> convincing evidence.'" <u>Rice v. Collins</u>, 546
> U.S. 333, 339, 126 S.Ct. 969, 163 L.Ed.2d 824
> (2006) (quoting 28 U.S.C. § 2254(e)(1)).

<u>Eley</u>, 712 F.3d at 846. (footnote omitted).

In applying the deference required under § 2254(d), habeas

courts must look to the last state court adjudication on the merits

of the petitioner's claim. <u>See</u> <u>e.g.</u> <u>Greene v. Fisher</u>, 565 U.S. 34,

40 (2011). If the highest state court decision did not provide

reasons for the decision, "the federal court should 'look through'

the unexplained decision to the last related state-court decision

that does provide a relevant rationale." <u>Wilson v. Sellers</u>, 138 S.

Ct. 1188, 1192 (2018).

B.   <u>Analysis</u>

1.   <u>Ground One: Miranda Violation</u>

In support of Ground One, Petitioner alleges the following

facts. On September 23, 2001, while in Petitioner's care,

Petitioner's son sustained injuries that required hospitalization. (Am. Pet., ECF No. 13 at 1-2.) When the child died, the Lower Township Police Department investigated for abuse. (Id. at 2.) Petitioner's attorney asserted Petitioner's right to remain silent on September 25, 2001. (Id.) The following day, through Petitioner's parents, the police asked Petitioner for an interview. (Id.) Petitioner appeared at the police headquarters. (Id.) At one point, he asked to speak to his parents "and otherwise conveyed to the police that he was attempting to reassert his right to remain silent." (Id.) The police obtained statements from Petitioner that were used to incriminate him at trial. (Id.)

In opposition to relief on Ground One, Respondents contend Petitioner has overly simplified the events that occurred. (Answer, ECF No. 18 at 53.) Respondents argue that Petitioner did not reassert his right to remain silent when he asked to speak to his father during the September 26 interview. (Id. at 55.) Petitioner had fired his attorney and returned to give his statement. (Id.) He was given written and oral Miranda warnings and a waiver of rights form before continuing. (Id. at 56.)

During the interview, investigators told Petitioner his story did not match the physical evidence, so Petitioner gave a different story. (Id.) When his second story was questioned, he asked to speak to his parents. (Id.) Petitioner did not ask to terminate the interview or to speak to a lawyer. (Id.) When one of the

22

investigators left the room, ostensibly to get Petitioner's parents, the remaining investigator asked why he wanted to speak with his parents. (Answer, ECF No. 18 at 56.) Petitioner then confessed to murdering his son. (Id.)

Respondents conclude that the Appellate Division was correct in determining that Petitioner never indicated that he wanted to stop talking to investigators, only that he wanted a break to speak to his parents. (Id. at 57.) The police were free to inquire as to the reason for the request and were not required to accept the request as an assertion of the right to silence. (Id.)

In reply, Petitioner states that his Miranda claim is based on questioning by investigators on September 26, 2001. (Petr's Reply, ECF No. 21 at 45.) He argues that once he expressed his desire not to speak with police, no matter the reason, the police must cease questioning. (Id.) Petitioner contends he had the right to rely on the assumption that when one investigator left to get his parents, he would not be questioned in the meantime. (Id. at 46.) Thus, by asking why he wanted to speak with his parents, police violated his right to remain silent. (Id.)

Miranda v. Arizona, 384 U.S. 436 (1966) is the clearly established Federal law that governs habeas review of this claim. In Miranda, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates

the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Once a person has been informed of his right to remain silent, any statement he does make may be used as evidence against him; a person has a right to the presence of an attorney, retained or appointed; and a person may waive these rights if he does so voluntarily, knowingly and intelligently. Id. If the person subject to custodial interrogation "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. at 444-45.

In 1981, the Supreme Court in Edwards held that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." Davis v. United States, 512 U.S. 452, 454 (1994) (citing Edwards v. Arizona, 451 U.S. 477 (1981)). In 1994, in Davis, the Court addressed "how law enforcement officers should respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the Edwards prohibition on further questioning." Id. The Court stated, "[n]othing in Edwards requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer." Id. at 460. Further, "if the suspect is 'indecisive in his request for counsel,' the officers need not always cease questioning.'" Id. (quoting Miranda, 384 U.S. at 474). Thus, the Court held, "after a knowing

and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Id. at 461.

In the event that a suspect makes an ambiguous or equivocal statement, clarifying questions by law enforcement might be good practice, but the Court declined "to adopt a rule requiring officers to ask clarifying questions." Id. "[I]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461–62.[1]

The Appellate Division's opinion on direct review is the highest state court determination on the merits of Petitioner's Miranda claim. Although the state court relied on state law, it concluded that "[d]uring interrogation, the police are permitted to attempt to determine whether a request to take a break from the interrogation is in fact an assertion of a defendant's right to remain silent." Roman I, 887 A.2d at 728. Renewed Miranda warnings were not necessary after the detective clarified that Petitioner's request to speak to his parents was not a re-assertion of his right to remain silent. Roman I, 887 A.2d at 728

---

[1] In 2010, the Supreme Court held that the standard announced in Davis concerning ambiguous requests for counsel after a waiver of Miranda rights also applied to ambiguous invocations of the right to remain silent. Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). This case, however, was decided after the Appellate Division denied Petitioner's Miranda claim in 2005.

The Appellate Division's opinion was neither contrary to nor an unreasonable application of clearly established Federal law because <u>Davis</u> requires an unambiguous assertion of a <u>Miranda</u> right before law enforcement is required to cease questioning a suspect. On September 26, Petitioner waived his <u>Miranda</u> rights and was voluntarily interviewed by police. Petitioner's request to speak to his parents was not an unambiguous assertion of a <u>Miranda</u> right.

Consistent with <u>Davis</u>, the Appellate Division held that police are permitted to attempt to determine whether an ambiguous request was in fact an assertion of a defendant's <u>Miranda</u> rights. Petitioner responded to the question of why he wanted to speak to his parents with his confession. The confession was not obtained in violation of due process. Therefore, Ground One of the amended petition is denied.

### 2. Ground Two: Prosecutorial Misconduct

In support of Ground Two, Petitioner alleges that his trial was marred by objectionable commentary by the prosecutor in the presence of the jury. (Am. Pet., ECF No. 13 at 4-5.) Petitioner was tried for abusing his twin sons and killing one of them. In the prosecutor's opening statement, she repeatedly referred to Petitioner's conduct as unthinkable and unspeakable and said "you don't want to talk about things that are seen on kids. I mean we're all adults, it's our job to protect them." (Am. Pet., ECF No. 13 at 4.)

On cross-examination, the prosecutor referred to Petitioner as "nothing more than a despicable liar." (Id. at 5.) During closing argument, the prosecutor used a football analogy to explain why certain rib injuries to the twins could not have been accidents. (Id.) Further, due to a discovery violation, the trial court forbade the prosecutor from arguing about evidence of the victim's multiple skull fractures because the prosecutor elicited such testimony from a witness without providing the defense advance notice. (Id.) The prosecutor discussed this evidence in her closing argument. (Id.)

In response to Ground Two, Respondents note that four of the objectionable comments made by the prosecutor were raised on direct appeal and addressed by the Appellate Division. (Answer, ECF No. 18 at 58.) The Appellate Division found that while the comments were improper, they were harmless beyond a reasonable doubt. (Id. at 64.)

As to Petitioner's due process challenge to Dr. Boal's testimony about multiple skull fractures, Respondents note the due process claim was raised for the first time in a post-conviction relief petition, but the claim had been waived because it should have been raised on direct review. (Id.) Respondents assert Petitioner procedurally defaulted the claim by not raising it on direct review and he has not shown cause and prejudice or a

fundamental miscarriage of justice to excuse the default. (Answer, ECF No. 18 at 66.)

In Petitioner's reply, he disagrees that the prosecutor's misconduct was harmless error. (Petr's Reply, ECF No. 21 at 49-50.) Petitioner further argues that appellate counsel's failure to raise the issue of prosecutorial misconduct was the cause for procedural default of the claim. (Petr's Reply, ECF No. 21 at 53-54.) Petitioner contends the prejudice to him is that testimony of a single skull fracture supports a theory of negligent or reckless parenting and multiple skull fractures support the theory of intentional homicide, which the prosecutor knew when she elicited the improper testimony. (Id. at 54.)

The Court will address Petitioner's claim regarding the prosecutor's reference to Dr. Boal's testimony in Ground Six below, in the context of whether appellate counsel's failure to raise the issue on direct appeal was cause and prejudice excusing Petitioner's procedural default of the prosecutorial misconduct claim on direct review. The Court notes, however, that Petitioner, in his PCR proceeding, asserted appellate counsel was ineffective for not raising this issue of prosecutorial misconduct. The Appellate Division held, "[w]e do not find that this omission meets the Strickland/Fritz standard discussed above. This claim would not have changed our finding that the cumulative prosecutorial misconduct did not deprive defendant of a fair trial." Roman II,

2010 WL 4103531, at *5. The Court restricts discussion of Ground Two to the prosecutorial misconduct claims addressed by the Appellate Division on direct review.

The "clearly established Federal Law" for a denial of due process claim based on prosecutorial misconduct is the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986). Parker v. Matthews, 567 U.S. 37, 45 (1986). A prosecutor's improper comments violate the Constitution "only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Darden, 477 U.S. at 181) (quoting Donnelly v. DeChristoforo, 416 U.S. 627, 643 (1974)). "Particularly because the Darden standard is a very general one," courts have "'more leeway … in reaching case-by-case determinations[.]" Id. at 48 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

The Appellate Division's decision on direct appeal is the highest state court decision on the merits of this claim. The Appellate Division found that

> prosecutorial excesses occurred in the opening statement and that misconduct transpired when the prosecutor argued that adults need to protect children, analogized the newborns' broken ribs to a football player's, and cross-examined by implying that defendant's presence during the presentation of the State's case was improper. Yet, such flaws alone do not justify a reversal of the conviction. … When all of the offending conduct is considered against the strength of the State's evidence

> we cannot conclude that the prosecutor's
> tactics deprived defendant of a verdict that
> fairly reflected the evidence. … The evidence
> against defendant was strong and could easily
> have justified the murder conviction sought by
> the prosecutor, yet defendant was acquitted of
> murdering Edward Jr. and convicted of lesser-
> included aggravated manslaughter. Defendant
> was also acquitted of the endangering and
> aggravated assault charges that related to his
> conduct toward both twins preceding Edward
> Jr.'s death. It seems evident that, because
> the charges of conduct preceding the infant's
> death were based upon the forty-four fractured
> ribs of the newborns, the jury apparently was
> not swayed by the prosecutor's misleading
> football-player analogy.

State v. Roman, 887 A.2d at 725.

Key here is the Appellate Division's finding that "[w]hen all of the offending conduct is considered against the strength of the State's evidence we cannot conclude that the prosecutor's tactics deprived defendant of a verdict that fairly reflected the evidence." Evidence at trial showed Petitioner lied about the cause of E.R.'s injury upon immediately seeking medical treatment and he lied repeatedly thereafter. Petitioner first said E.R. fell off the couch and hit his head. This story was unconvincing because seven-week-olds cannot roll on their own and a short fall from a couch would not create enough force to cause E.R.'s significant head injuries. Then, Petitioner said that after the baby fell off the couch, he picked him up but tripped and dropped the baby. He later added that when dropped, the baby slid across the floor and hit his head against the wall with some force.

Ultimately, Petitioner confessed to killing his son by slamming his head between his knees because he would not stop crying. At trial, Petitioner testified that the baby accidently fell against his knees. On top of these changing stories, Petitioner was also shown on cross-examination to have lied about his lack of complicity in a past conviction for burglary.

The prosecutor's indiscretions seem small in comparison with evidence properly used to convict Petitioner of aggravated manslaughter of E.R. The Appellate Division's determination that defendant was not deprived of a verdict that fairly reflected the evidence at trial was not contrary to or an unreasonable application of Darden's rule that the Constitution prohibits only prosecutorial misconduct that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Therefore, Ground Two of the amended petition is denied.

### 3.  Grounds Three and Four

In his reply brief, Petitioner withdraws Grounds Three and Four of the amended petition because his claims were based on state rights not federal constitutional rights. (Petr's Reply, ECF No. 21 at 56.)

### 4.  Ground Five:   Ineffective Assistance of Trial Counsel

There are two elements to a Sixth Amendment ineffective assistance of counsel claim, deficient performance by counsel and

prejudice. Premo v. Moore, 562 U.S. 115, 121 (2011) (citing Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. 668, 697 (1984). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Premo, 562 U.S. at 121.

For the deficient performance prong, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. (internal quotations omitted) (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). A petitioner must overcome a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. (quoting Richter, 562 U.S. at 104) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)).

The burden a petitioner must meet is "'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" Premo, 562 U.S. at 122 (quoting Richter, 562 U.S. at 104) (quoting Strickland, 466 U.S. at 687)). "Reliance on 'the harsh light of hindsight' … is precisely what Strickland and AEDPA seek to prevent." Richter, 562 U.S. at 107 (quoting Bell v. Cone, 535 U.S. 685, 702 (2002)).

Habeas review of counsel's performance is doubly deferential, and the question is not whether counsel's actions were reasonable but whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard. <u>Id.</u> at 105 (citations omitted).

Petitioner alleges the following instances of ineffective assistance of trial counsel.

> a. <u>Failing to call Dr. Shane to testify about cause of death</u>

Defense counsel hired a forensic pathologist, Dr. Shane, who was prepared to testify that (1) E.R. sustained just one skull fracture; (2) E.R. did not sustain brain injury; (3) and to an alternate cause of death. (Am. Pet., ECF No. 13 at 15.) Defense counsel did not call Dr. Shane to testify, and Petitioner alleges this decision was based on his counsel's financial motive of maximizing his own fees. (<u>Id.</u> at 16.)

The Appellate Division remanded this issue to the PCR Court to hold an evidentiary hearing on whether Petitioner's counsel refused to call Dr. Shane to testify because Petitioner did not pay the $2,500.00 testimonial fee. (Answer, ECF No. 18 at 88.) The Appellate Division found that Dr. Shane's testimony might have affected the jury verdict because he would have testified to an alternate cause of death. (<u>Id.</u>)

In reply, Petitioner contends that no competent attorney would defend this case without the intention of calling an expert

witness to explain E.R.'s skull fracture. (Petr's Reply, ECF No. 21 at 59.) Petitioner's trial counsel had intended to call Dr. Shane to testify that there was only one skull fracture, and the cause of death was negligent intubation. (Id.)

Petitioner suggests the Appellate Division's decision should not be accorded AEDPA deference because it "does not withstand fair-minded scrutiny." (Id.) Petitioner asserts the fact that counsel did not hire a different expert after Dr. Shane's testimony was rejected in the separate Division of Youth and Family Services matter indicates that the motive in not calling an expert was financial. (Id. at 60.) Petitioner also questions why, if his counsel believed Dr. Shane lacked credibility, that he argued in summation that there was only one blow to the victim's head and the cause of death was negligent intubation, the theory Dr. Shane's testimony would have supported. (Id.)

Petitioner also suggests the Appellate Division should have accepted the testimony of Petitioner's PCR witnesses, that Petitioner and his family had already paid trial counsel to procure Dr. Shane's trial testimony, and counsel told them he would not pay for Dr. Shane's trial testimony. (Petr's Reply, ECF No. 21 at 61-62.) Petitioner contends the Appellate Division misconstrued the testimony as a dispute over when Dr. Shane would be paid as opposed to who would pay Dr. Shane. (Id. at 62.) Petitioner contends he was prejudiced by his attorney's decision not to call

Dr. Shane because he had no chance for an outright acquittal without testimony that there was only one blow to E.R.'s head and the cause of death was negligent intubation. (Id.)

Habeas review is of the Appellate Division's 2015 decision on appeal of the PCR court's denial of relief after remand. The Appellate Division affirmed the PCR Court, summarizing the PCR Court's comprehensive findings and holding that the findings were supported by credible evidence. Roman III, 2015 WL 3843266, at *3.

Petitioner's trial counsel testified that he decided not to call Dr. Shane after he testified on Petitioner's behalf in a Title 9 action filed by the Division of Youth and Family Services. Id. The Family part judge "stated myriad reasons" why the judge did not find Dr. Shane to be a credible witness. Id. Petitioner's trial counsel testified that defendant's ability to pay Dr. Shane was not the reason he did not call him to testify in the criminal trial, but rather that he did not think the jury would believe his testimony. Roman III, 2015 WL 3843266, at *3.

In addition, shortly before trial, Petitioner's trial counsel learned of possible inaccuracies in Dr. Shane's curriculum vitae, which might undermine his credibility. Roman III, 2015 WL 3843266, at *3. Petitioner's trial counsel thought Petitioner's best defense was that the baby's death was an accident, and calling Dr. Shane to give graphic medical testimony about the baby's injuries could be harmful to the defense. Id.

The PCR Court permitted Dr. Shane to testify and found that he had been forced on cross-examination to concede important points helpful to the State. _Roman III_, 2015 WL 3843266, at *3. Review of the PCR Court findings show that cross-examination called into question the credibility of Dr. Shane's testimony that E.R. suffered only one skull fracture. (PCR Evid. Hrg. Tr., ECF No. 18-38 at 101-104; ECF No. 18-39 at 39-44.) Dr. Shane also testified that it was his practice to bill for his services after he performed the work, which further called into question a financial reason for not obtaining his testimony. _Roman III_, 2015 WL 3843266, at *4.

The PCR judge also believed trial counsel's testimony that he discussed the defense strategy with Petitioner. _Id._ The Appellate Division noted the strategy was partially successful because the jury acquitted Petitioner of most of the charges, including first degree murder. _Id._ The Appellate Division noted that the PCR Court found Dr. Shane's testimony was not likely to have changed the outcome of the trial. _Id._

Petitioner urges the Court not to grant deference to the Appellate Division's findings because the findings do not withstand scrutiny. The Court disagrees. The Appellate Division noted, and the records supports, that the PCR court conducted a comprehensive hearing to determine whether defense counsel refused to call Dr. Shane to testify for financial reasons. (PCR Evid.

Hrg. Tr., ECF Nos. 18-38 to 18-41.) The PCR Court carefully weighed the evidence and gave good reasons for finding it was the defense trial strategy, not financial reasons, that Dr. Shane was not called to testify. (PCR Evid. Hrg. Tr., ECF No. 18-41 at 9-90.)

Petitioner suggests expert testimony that E.R. had only one skull fracture and that improper intubation was an intervening cause of death was his only chance for acquittal on aggravated manslaughter. Thus, if his counsel truly feared Dr. Shane's testimony would not be believed, he would have obtained a different expert. Petitioner contends the only reason for not doing so was financial.

This assumes that the defense could obtain a persuasive medical opinion that E.R. suffered only one skull fracture or that his head injuries were not the cause of death, where the State's evidence regarding these facts was strong. Petitioner questions why his counsel would have suggested in closing argument that E.R. suffered only one skull fracture and died from intervening improper intubation without having Dr. Shane testify about his opinions. The answer is simple. If Dr. Shane testified he would be subject to cross-examination and his medical opinions might not raise reasonable doubt with the jury. Raising these arguments in closing without cross-examination was likely a strategic decision.

Further, the theory that improper intubation was an intervening cause of death would have gone against the medical

evidence and opinions. Dr. Weisburg testified E.R. was breathing with assistance of intubation, a tube in his windpipe through which air and oxygen were being pushed, when he arrived in the emergency room. (Trial Tr., ECF No. 18-9 at 73.) He also testified that, in children, it is very common that the tube used to intubate is placed a little farther on one side than the other. (Id. at 75.) It is preferable to have the tube more in the middle because, over the long term, if the tube was more to one side you would tend to breathe on one lung rather than both. (Id.) The tube was a little bit lower in the right side, so they pulled it back a small amount to aerate both lungs. (Id. at 76.)

On cross-examination, Dr. Weisburg testified that when E.R. arrived in the emergency room, his left lung was collapsed and he was not breathing on his own but by intubation into one lung. (Id. at 83.) Defense counsel asked Dr. Weisburg whether having the tube "only down one lung" affected E.R.'s breathing process. (Id. at 87.) Dr. Weisburg explained that E.R. was receiving oxygen "but not ventilating as well as, perhaps, could be if it was on both sides." (Id.) There was no suggestion in any of the factual or medical opinion testimony that "improper" intubation could have had anything to do with E.R.'s death.

The defense focused on testimony from multiple witnesses that Petitioner had been a good father, E.R.'s head injury was accidental, and the confession was coerced at a time when

Petitioner was under great emotional distress. Double deference to the state court findings and trial counsel's professed strategy are appropriate here, whereas hindsight is not. Petitioner has not shown that his trial counsel provided ineffective assistance by failing to call Dr. Shane as an expert witness.

b.   Failing to challenge multiple skull fracture and brain injury testimony

The prosecutor elicited Dr. Boal's testimony that E.R. sustained multiple skull fractures and brain injury. (Am. Pet., ECF No. 13 at 16.) The trial court sustained the defense's objection to the testimony because it was not contained in Dr. Boal's opinion disclosed to the defense.[2] (Id.) Defense counsel did not move for a mistrial, move to strike the testimony or instruct the jury to disregard the testimony. (Id.) At sentencing, the judge relied on the fact that there were multiple skull fractures, suggesting an intentional rather than accidental injury. (Am. Pet., ECF No. 13 at 16.)

During a colloquy, the prosecutor explained that she did not elicit the multiple skull fracture and brain injury testimony from Dr. Gross because those were not his findings. (Id. at 16-17.)

---

[2] In the PCR Court, Petitioner's counsel explained that the prosecution elicited this testimony on redirect without submitting a supplemental expert report after Dr. Boal reviewed E.R.'s CT scan and concluded there was brain injury. Dr. Boal was initially called to testify about the babies' rib fractures and in her expert report stated she had not reviewed the CT scan of E.R.'s head. (PCR Court Hrg. Tr., ECF No. 18-30 at 5-10.)

Knowing this, defense counsel failed to call Dr. Gross to rebut Dr. Boal's testimony. (Am. Pet., ECF No. 13 at 17.)

In reply, Petitioner contends he was prejudiced because the court relied on the "two-blow" testimony as an aggravating factor at sentencing. (Petr's Reply, ECF No. 21 at 64.) Further, it was not enough for defense counsel to object to Dr. Boal's testimony because the jury heard it, it was not stricken, and the prosecutor repeated it in closing argument. (Id. at 65.)

Habeas review is of the Appellate Division's 2010 decision affirming the PCR court. The Appellate Division held that counsel's failure to request additional relief "does not constitute ineffective assistance of counsel." Roman II, 2010 WL 4103531, at *4. When a higher state court does not give reasons for its decision on the merits, a habeas court must look through to the reasons given by the lower state court for denying the claim.

The PCR Court stated:

> Trial counsel did object to Doctor Boll's [sic] testimony relating to brain injury. The Court is, again, uncomfortable with the means by which that testimony developed and the surprise that it visited upon defense counsel. Yet, cause of death was not, in anyone's opinion, brain injury. And so while the Court, again, uncomfortable with the State's arguable response of no harm, no foul, nonetheless, Boll's [sic] testimony with regard to brain injury of marginal relevance, if any, at least in this Court's view.

(PCR Court Tr., ECF No. 30 at 63.)

40

The PCR Court also rejected Petitioner's ineffective assistance of counsel claims under the prejudice prong of the <u>Strickland</u> test.

> And it is in the latter regard, the second prong of <u>Strickland</u> that the defense positions encounter difficulty, at least in this Court's view. This jury, on the record before it, returned a verdict of guilty unanimously and beyond a reasonable doubt for aggravated manslaughter, a violation of 2C:11-4(a)1, the reckless causing of death under circumstances manifesting extreme indifference to human life. Defense counsel argues that but for counsel's performance, assertedly deficient, that this jury would more likely have returned a verdict of reckless manslaughter, in violation of 2C:11-4(b)1. The defense argument, stated otherwise, and I attempted to pose it several times to defense counsel, so I am satisfied it is articulated in the record, but I restate it one more time in this decision, is that the errors of which the defense complains, the deficiencies of prior counsel at trial, had they not occurred, would have reasonably led this prior jury to convict, if at all, not of first degree aggravated manslaughter, but second degree reckless manslaughter; stated otherwise, that the jury would have been less likely to find the Defendant to have recklessly caused the death of his seven week old infant child, quote, "under circumstances manifesting extreme indifference to human life." The analysis if necessarily fact sensitive. The evidence before this jury, however, the most powerful evidence that supports the verdict actually returned, is not challenged. The Defendant's admission, his statement, as to exactly what he did, why he did it, the number of times he did it, how he did it, his anger at the moment that he committed it. If the Court disregards the Defendant's self-description of his conduct while giving his statement, specifically disregards any self-

description invoking murder, that conduct does not readily, easily, or even remotely fall within the – within this Court's understanding of the parameters of recklessness. That conduct which the Defendant told law enforcement, through his post-Miranda statement, he committed constitutes circumstances manifesting extreme indifference to human life. The jury got it right, in this Court's view, made a sophisticated distinction between first degree murder and first degree aggravated manslaughter.

(PCR Court Tr., ECF No. 18-30 at 61-62.)

In addition to these reasons cited by the PCR Court, the following evidence in the state court record supports the finding that Dr. Boal's testimony concerning brain injury and multiple skull fractures was of little consequence. First, as to the defense theory that there was only one skull fracture and only one blow to the head, Dr. Gross testified that upon examining the inside of E.R.'s head, he found hemorrhaging and "fractures on both sides of the skull." (Trial Tr., ECF No. 18-9 at 35-36.) The two fractures were on the right parietal bone and the left parietal bone. (Id. at 50.) He testified that

one can have a solitary fracture, but the presence of two distinct fractures … or the presence of the extensive scalp hemorrhage and the hemorrhage which was also present subsequent – that I identified subsequently in the cranial cavity were distinctly – reflected trauma that, in my opinion, had to be inflicted.

(Trial Tr., ECF No. 18-9 at 36.) After performing the autopsy, Dr. Gross found the cause of death was "subdural hemorrhage due to fractures of the skull due to blunt-force trauma" which he later confirmed after further study. (Id. at 37, 39.)

On cross-examination, Dr. Gross testified it was his opinion that one impact of the head could not have produced the two fractures that he observed. (Id. at 51.) Defense counsel also asked Dr. Gross "you've indicated in your report there's a subdural hematoma where there's a basic blood formation between the dura and the arachnoid. Now was there any damage to the brain tissue at all in your findings?" (Id. at 56.) Dr. Gross answered, "I did not observe damage to the brain tissue." (Id.)

Second, as to the defense theory of an alternate cause of death, Dr. Weisburg, an emergency room physician at Burdette Tomlin Memorial Hospital ("Burdette"), testified for the State about his treatment of E.R. on September 23, 2001, and about the emergency department medical records concerning E.R.'s care. (Trial Tr., ECF No. 18-9 at 68-69.) The information the emergency department first received about E.R. was that he was in cardiac arrest, meaning his heart was not beating. (Id. at 71.) When E.R. arrived at Burdette, he was breathing with the assistance of intubation, a tube in his windpipe through which air and oxygen were being pushed. (Id. at 73.) E.R's heart was beating. (Id.) E.R., however, was limp and unresponsive to stimuli that would normally evoke a response. (Id.

at 74.) E.R. also exhibited a very low P.H. blood-gas, indicating "there's been no circulation for a while." (Trial Tr., ECF No. 18-9 at 74.)

Dr. Weisburg ordered a CT scan of E.R.'s head. (Id. at 76.) The radiologist sent Dr. Weisburg the immediate reading of the CT scan and also called him to discuss the findings. (Id. at 79.) The CT scan indicated skull fracture in the back of the head, multiple areas of bleeding and bruising, swelling of the brain, and small frontal subdural, meaning blood in front of the brain between the brain and the skull. (Id. at 79.)

Dr. Lind testified as the State's medical expert based on her review of E.R.'s medical records, including the autopsy report and a pediatric radiology report by Dr. Boal. (Trial Tr., ECF No. 18-10 at 8-9.) Dr. Lind explained that after a significant head injury, like E.R.'s, there is an immediate neurologic change that quickly leads to cessation of breathing. (Id. at 27.) Upon reviewing the autopsy, Dr. Lind opined that the child suffered an injury to the skull and the brain. (Id. at 13.) The cause of death was subdural hemorrhage and fractures of the skull. (Id.) Dr. Lind testified that "rolling off a couch isn't a high enough velocity to cause significant skull fracture and brain injury and bleeding." (Id. at 14.)

Petitioner was not prejudiced by counsel's failure to seek a mistrial, to ask for a limiting instruction or to strike Dr. Boal's

testimony about E.R.'s CT scan because her testimony about "multiple" skull fractures, in this case two, was merely cumulative of Dr. Gross's testimony. Her testimony about brain injury was cumulative of Dr. Lind's testimony. Even in the absence of Dr. Boal's testimony about multiple skull fractures and brain injury, Petitioner had to overcome properly admitted evidence that he suffered two skull fractures and bleeding and swelling around the brain caused his death. This claim of ineffective assistance of counsel is denied.

### c. Failing to call E.R.'s mother to testify

Petitioner's girlfriend, E.R.'s mother, was not called to testify on Petitioner's behalf. (Am. Pet., ECF No. 13 at 17.) Petitioner's defense counsel shared office space with his girlfriend's attorney, who represented her in proceedings to deprive her of custody of J.R., E.R.'s brother. (Id.) "Defense counsel and the girlfriend's counsel attended a meeting where they agreed that one would represent the other." (Id.) Petitioner contends his counsel did not call E.R.'s mother to testify because it was inconsistent with her interests. (Id.)

The highest state court that addressed this claim was the Appellate Division on PCR Appeal. The Appellate Division found that this claim lacked sufficient merit to warrant discussion in a written opinion. Roman II, 2010 WL 4103531, at *4. Thus, the Court looks to the PCR Court's reasons for denying the claim.

The PCR Court denied this claim as follows:

> I'm unable to find a prima facie showing of a conflict of interest between this Defendant's trial counsel and counsel representing the mother of the deceased infant, Ms. Holton. The fact of proximity of offices, without more, does not give rise to that apparent or even appearance -- to that conflict or even appearance of conflict. Ms. Holton apparently did not testify. There's nothing before the Court to indicate that Defendant actually sought to compel her testimony. There is no competent evidence before this Court as to any such inappropriate relationship or conflict. Even had Ms. Holton testified, she was not present at the time of the infliction of the injuries which directly and proximately caused the death of the infant. She might have been able to testify as to her opinion as to the prior conduct, the prior parenting by this Defendant of the two twins. Were that testimony to have been adduced, of marginal probative value, in this Court's view.

(PCR Court Hrg. Tr., ECF No. 18-30 at 63-64.)

Even if counsel was ineffective for failing to call Ms. Holton to testify due to a conflict of interest, the PCR Court reasonably determined that Petitioner was not prejudiced under the Strickland standard of review. Petitioner's parents and friends testified that Petitioner was a good parent, and Ms. Holton's testimony would have been cumulative. More importantly, as the PCR Court noted, Ms. Holton was not present when E.R. was fatally injured. She might have testified that she believed E.R.'s injury was an accident, but this was contradicted by Petitioner's confession as well as

the medical opinions. Therefore, Ground Five of the amended petition is denied.

### 5. Ground Six: Brady Violation

In support of Ground Six, Petitioner alleges a Brady violation for failing to inform the defense that Dr. Gross, the county medical examiner who performed E.R.'s autopsy, and Dr. Lind, a pediatrician and prosecution witness, told the prosecutor they could not opine that E.R. had suffered multiple skull fractures or that E.R. sustained brain damage. (Id. at 22.)

When the prosecution called Dr. Boal as an expert witness, Dr. Boal testified that E.R. suffered multiple skull fractures and brain injury, although her expert report did not discuss skull fractures and stated she did not review any brain CT scans. (Am. Pet., ECF No. 13 at 22.) When defense counsel objected, the prosecutor explained that she elicited these opinions from Dr. Boal because Dr. Gross and Dr. Lind could not provide this opinion. (Id. at 23.)

Respondents contend Dr. Boal's testimony, her opinion and the CT scan upon which her testimony was based were not exculpatory. (Answer, ECF No. 18 at 99.) The prosecutor did not violate Brady by failing to provide an oral opinion from Drs. Gross, Weisberg and Lind about their reviews of the CT scan because the results of the CT scan and the doctors' opinions about it were not exculpatory. (Id. at 101-102.) Dr. Weisburg's opinion that E.R.

suffered a severe head injury was confirmed by CT scan showing multiple hemorrhages in multiple areas of the brain. (Answer, ECF No. 18 at 102.) Dr. Lind also determined that E.R. suffered a brain injury. (Id. at 103.) The Appellate Division determined that the opinions of the State's doctors concerning the CT scan were not exculpatory. (Id. at 104.)

Brady v. Maryland 373 U.S. 83 (1963) is the clearly established Federal Law governing habeas review. In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

Petitioner raised this claim for the first time in the PCR Court. Although the Appellate Division on PCR review noted the claim should have been raised on direct appeal, it also held that the material was not exculpatory and did not implicate the defendant's rights under Brady. Roman II, 2010 WL 4103531, at *4.

48

The Appellate Division's decision is not contrary to or an unreasonable application of Brady.

Although his testimony was based on the autopsy he performed after the CT scan was taken, Dr. Gross testified that E.R. had two skull fractures and that E.R.'s cause of death was "subdural hemorrhage due to fractures of the skull due to blunt-force trauma (Trial Tr. ECF No. 18-9 at 37.) Dr. Lind also characterized E.R.'s hemorrhaging and swelling as a brain injury. Dr. Lind explained that after a significant head injury, like E.R.'s, there is an immediate neurologic change that quickly leads to cessation of breathing. (Id. at 27.) The prosecution did not withhold exculpatory evidence from Petitioner regarding the number of E.R.'s skull fractures and or the cause of death. Therefore, Ground Six of the amended petition is denied.

### 6. Ground Seven: Ineffective Assistance of Appellate Counsel

First, Petitioner alleges his appellate counsel was ineffective by failing to directly appeal the issues regarding whether E.R. suffered brain injury and the number of skull fractures. (Am. Pet., ECF No. 13 at 26.) Respondents construe this as a claim that appellate counsel failed to raise a Brady claim, and respond that Dr. Boal's testimony was not exculpatory. (Answer, ECF No. 18 at 109). Because the Brady issue was not meritorious, counsel was not ineffective for failing to raise it. (Id.)

Respondents are correct. Appellate counsel was not ineffective by failing to appeal the Brady claim because Dr. Gross in fact testified that E.R. had two skull fractures caused by two impacts, not one blow to the head. (Trial Tr. ECF No. 18-9 at 27.) Although Petitioner argues that Dr. Shane would have testified there was only one skull fracture, on cross-examination in the PCR hearing, Dr. Shane admitted there was more than one skull fracture. (PCR Evid. Hrg. Hr., 18-39 at 39-44, 48-51.) Additionally, Dr. Gross and Dr. Lind opined that E.R.'s head injuries, as described in his CT scan and the autopsy report, were his cause of death. Therefore, appellate counsel was not ineffective for failing to raise the Brady claim on direct appeal.

The second claim of ineffective assistance of appellate counsel is based on the prosecutor's misconduct in cross examination. The prosecutor asked Petitioner "And you had the opportunity to listen to every one of the State's witnesses, correct?" (Am. Pet., ECF No. 13 at 26) Petitioner contends his appellate counsel failed to apprise the Appellate Division that the "opportunity to listen" cross-examination is a prohibited reference to "tailoring." (Id.)

Habeas review is of the highest state court's reasoned decision, the Appellate Division's Opinion on PCR review. The Appellate Division on PCR appeal noted that Daniels was decided after Petitioner filed his direct appeal brief. Roman II, 2010 WL

4103531, at *5. Therefore, counsel was not ineffective for failing to address a case that had not yet been decided.

But even if this Court assumes counsel could have filed a supplemental brief before the Appellate Division issued its opinion, there is no prejudice because the Appellate Division considered the Daniels case and found prosecutorial misconduct did not deprive Petitioner of a fair trial. Roman I, 887 A.2d at 725. For the reasons discussed in Ground Two above, the Appellate Division's determination of the prosecutorial misconduct claim was not contrary to or an unreasonable application of Darden. Therefore, no prejudice resulted from appellate counsel's failure to apprise the Appellate Division of Daniels in a supplemental brief. Ground Seven of the amended petition is denied.

V.    CERTIFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further." <u>Miller-El v.</u> <u>Cockrell</u>, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

VI. CONCLUSION

In the accompanying Order filed herewith, the amended petition for habeas relief under 28 U.S.C. § 2254 is denied.


Dated: September 18, 2019

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**